

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| CHRISTIAN ALBERTO MARTINEZ, | § | No. 08-14-00130-CR |
| Appellant, | § | Appeal from |
| v. | § | 210th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 2011D01837) |
| | § | |

## **O P I N I O N**

In this appeal from a capital murder trial, Appellant raises issues concerning the effective assistance of counsel, the failure to disqualify the State's attorneys or suppress evidence, the exclusion of lay and expert testimony, and the imposition of a life sentence without the possibility of parole on a person with diminished mental capacity. The case itself arises out of the senseless murder of two women. For the reasons that follow, we affirm.

### **FACTUAL SUMMARY**

Appellant was convicted by a jury of the capital murder of mother and daughter, Amalia Flores and Jovanna Flores. Both women lived on Pratt Avenue in El Paso. On the afternoon of January 28, 2011, Nallely Galindo, who also lived there, came home to find blood on the floor. As she walked through the house, she saw her sister, Jovanna, lying motionless and covered with blood. She ran to her mother's bedroom, and found Appellant lying on the bed, also covered in

blood. She did know who Appellant was, but nonetheless shook him to see if he alive; he did not respond. She left the bedroom and soon found her mother, Amalia, also dead and bloodied from multiple stab wounds. She then called 911.

When the police arrived, they did not immediately find Appellant, but noticed a closed and locked bathroom door off the master bedroom. After kicking in the door, they found Appellant on the floor covered in towels. He had a deep cut on his left wrist. When EMS tried to attend to him, Appellant became combative. He attempted to bite one the EMS personnel, and tried to pull the dressing off his arm. He was restrained and transported to a local hospital.

At the hospital, Appellant volunteered to an officer that he had had an argument with his girlfriend, and wandered around looking for a house to break into so he could find a gun to kill himself. When he could not find a gun in the Flores residence, he "got upset and snapped" and the next thing he knew both the Flores women were dead. Appellant told the physician who treated his wrist essentially the same story:

> The patient states that he broke into a home that he picked at random in search for a gun. Two people were in his way and he attacked them and stabbed them. Following that incident he lacerated his forearm. He also states that he was wishing for the police officer to shoot him dead on the site.

Amalia sustained some fifty-seven cuts or stab wounds. Jovanna had fifty-two cuts or stab wounds. Both women died from exsanguination, or in common parlance, they bled to death. Appellant did not contest any of these facts, and his trial counsel in fact elicited many of them from the witnesses. Rather, the focus of the defense strategy was insanity.

The jury found Appellant guilty of the murder of both Amalia and Jovanna and failed to find that Appellant was not guilty by reason of insanity. In the punishment phase, the jury found that that there was a reasonable probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. But the jury also found mitigating

2

circumstances such that he should be sentenced to life imprisonment without parole rather than receive the death sentence. The trial judge sentenced Appellant accordingly.

On appeal, Appellant raises five points of error, the first of which challenges the effectiveness of his trial counsel.

## INEFFECTIVE ASSISTANCE OF COUNSEL[1]

Appellant contends that he was denied effective assistance of counsel in one of two ways. First, he claims that trial counsel failed to move to suppress a warrantless search of his cell phone that was found at the scene of the crime. Second, he claims counsel failed to develop an adequate record to support the disqualification of the district attorney's office. Under the standards governing this claim, we disagree with both contentions.[2]

To prevail on a claim of ineffective assistance of counsel, Appellant must establish by a preponderance of evidence that: (1) his attorney's performance was deficient; and that (2) his attorney's deficient performance deprived him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex.Crim.App. 2005). Appellant must satisfy both *Strickland* components, and the failure

---

[1] Appellant was indigent. Because the State pursued the death penalty, Appellant sought and was appointed two attorneys to represent him. One of those attorneys is known to this court as a well-seasoned criminal defense attorney, and the other was the chief attorney in the El Paso Public Defender's Office. We collectively refer to both in the singular throughout this opinion.

[2] The State's first response is that the issue is waived based on briefing deficiencies. Specifically, the State claims that Appellant's first point is multifarious, because it combines two distinct arguments for how trial counsel was supposedly ineffective under a single point of error. But Appellant clearly teases out each of his ineffectiveness theories with distinct headings and arguments, and we have no problem understanding the different issues raised. *See Howard v. State*, 08-12-00154-CR, 2014 WL 4100690, at *7 (Tex.App.--El Paso Aug. 20, 2014, no pet.)(not designated for publication)("We will address Appellant's contentions that we are able to discern from the brief, if those contentions have been properly preserved for our review and have not been waived."). The State's other complaint is that Appellant has not separately briefed claimed violations under the state and federal constitutions. We acknowledge that litigants should distinctly brief state and federal constitutional claims. *See Muniz v. State*, 851 S.W.2d 238, 251 (Tex.Crim.App. 1993). When a brief combines state and federal constitutional claims, we assume that the Appellant can claim no greater protection under the state constitution than afforded by the federal constitution. *See Eldridge v. State,* 940 S.W.2d 646, 650 (Tex.Crim.App. 1996); *Fowler v. State,* 266 S.W.3d 498, 501-02 n.2 (Tex.App.--Fort Worth 2008, pet. ref'd). We treat Appellant's constitutional arguments accordingly. *See Buntion v. State*, 482 S.W.3d 58, 68 n.3 (Tex.Crim.App. 2016)(resolving similar multifarious point on the merits based on the argument as the court understands it).

3

to show either deficient performance or prejudice will defeat his ineffectiveness claim. *Perez v. State*, 310 S.W.3d 890, 893 (Tex.Crim.App. 2010); *Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex.Crim.App. 2003).

Under the first prong of the *Strickland* test, the attorney's performance must be shown to have fallen below an objective standard of reasonableness. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App. 1999). Stated otherwise, he must show his counsel's actions do not meet the objective norms for professional conduct of trial counsel. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex.Crim.App. 2002). Under the second prong, Appellant must establish that there is a reasonable probability that but for his attorney's deficient performance, the outcome of the case would have been different. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2069; *Thompson*, 9 S.W.3d at 812. "Reasonable probability" is that which is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Jackson v. State*, 973 S.W.2d 954, 956 (Tex.Crim.App. 1998).

We presume that the attorney's representation fell within the wide range of reasonable and professional assistance. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex.Crim.App. 2001), *citing Tong v. State*, 25 S.W.3d 707, 712 (Tex.Crim.App. 2000). Ineffective assistance claims must be firmly founded in the record to overcome this presumption. *Thompson*, 9 S.W.3d at 813. In most direct appeals, this task is very difficult because the record is undeveloped and cannot abundantly reflect a failing of trial counsel. *Id.* at 813-14; *see also Robinson v. State*, 16 S.W.3d 808, 813 n.7 (Tex.Crim.App. 2000). When the record is silent and does not provide an explanation for the attorney's conduct, the strong presumption of reasonable assistance is not overcome. *Rylander*, 101 S.W.3d at 110-11 (noting that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective").

4

Accordingly, when the record does not contain evidence of the reasoning behind trial counsel's actions, the attorney's performance cannot be found to be deficient. *Rylander*, 101 S.W.3d at 110-11; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994). With these standards in mind, we address each of Appellant's complaints about his trial counsel.

## Suppression of the Cell Phone

Trial counsel filed a motion to suppress several statements that Appellant made while in custody at the hospital. He was transported from the murder scene to a local hospital emergency room. Two detectives went to Appellant's room and addressed him by name. He asked them how they had gotten his name (the hospital chart reflected a different name for Appellant). Before they answered, however, Appellant himself surmised that they had gotten his name from his cell phone which he had left at the scene. At the same time, he told the detectives that he wanted to die for what he had done. He also volunteered to an officer guarding him details of what had happened. The motion to suppress focused on whether Appellant's interaction with the police was a custodial interrogation, or whether his statements were volunteered. The trial court excluded some of the statements but allowed others, including the statement about Appellant wanting to die for what he had done. No complaint is made of that ruling.

Instead, Appellant contends that his counsel was deficient in not moving to suppress the search of the cell phone itself. The police found what turned out to be Appellant's bloody cell phone in the master bedroom at the Flores residence. A detective used the phone to call another detective's phone, which through caller ID gave them information leading to Appellant's identity. The detectives then used that identifying information to confirm Appellant's identity by addressing him by name at the hospital. Appellant's first point of error contends that using the

5

phone to make a call was a search for which the police had neither a warrant, nor valid exception under the Fourth Amendment.

To prevail on an ineffective assistance claim based on counsel's failure to file a motion to suppress, Appellant would need to show that the result of the proceeding would have been different, i.e., that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to support his conviction. *Carmen v. State*, 358 S.W.3d 285, 295 (Tex.App.--Houston [1st Dist.] 2011, pet. ref'd), *citing Hollis v. State*, 219 S.W.3d 446, 456 (Tex.App.--Austin 2007, no pet.); *see also Jackson v. State*, 973 S.W.2d 954, 957 (Tex.Crim.App. 1998). The State points out that Appellant had no expectation of privacy in a cell phone that he left at murder scene, and thus any motion to suppress would have been a futile venture. And "[c]ounsel is not required to engage in the filing of futile motions." *Hollis,* 219 S.W.3d at 456. We agree.

An accused may challenge a search or seizure under the federal and state constitutions only if he has a legitimate expectation of privacy in the thing being searched or seized. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Granados v. State*, 85 S.W.3d 217, 222-23 (Tex.Crim.App. 2002). By leaving his cell phone in the Flores' residence, a place he had no right to be in the first place, he lost any legitimate expectation of privacy. *See State v. Granville*, 423 S.W.3d 399, 409 (Tex.Crim.App. 2014)("Although a person may have a reasonable and legitimate expectation of privacy in the contents of his cell phone, he may lose that expectation under some circumstances, such as if he *abandons his cell phone*, lends it to others to use, or gives his consent to its search." [Emphasis added].); *Swearingen v. State*, 101 S.W.3d 89, 101 (Tex.Crim.App. 2003)(a defendant lacks standing to contest the reasonableness of a search when he voluntarily abandons property). At the time the police found the phone, they

6

did not know whose it was. They did no more than initiate a call to determine the phone's ownership, and upon learning it was Appellant's, took no further steps to peruse the contents of the phone.

The attorneys' rationale for not challenging the inspection of the phone is not apparent from the record which is reason enough to reject the argument. *Rylander*, 101 S.W.3d at 110-11; *Jackson*, 877 S.W.2d at 771; *Peralta v. State*, 338 S.W.3d 598, 610-11 (Tex.App.--El Paso 2010, no pet.)(when the record is silent regarding the reasons for counsel's actions, the defendant fails to overcome the presumption of reasonableness). Even assuming that using the phone to make a call was a search, such that a motion to suppress might have been granted, we can easily envision multiple reasons why his counsel would not have pursued it. There was no question that Appellant was the person found at the murder scene as he was taken directly from the scene to the hospital. The police did not need the cell phone to tie him the murders. Nor does the State even need Appellant's correct identity to pursue his prosecution. TEX.CODE CRIM.PROC.ANN. art. 21.02(4)(West 2009)(allowing indictment by name if known, or if not, by description).

If Appellant's claim is that police knowledge of his identity led to one of his voluntary statements made at the hospital, the argument fares no better. The police had Appellant's fingerprints and DNA which might have independently led them to Appellant's identity. The statement that resulted from the detectives' interaction with Appellant where they used his name came into evidence from other witnesses and exhibits. Its admission through the detective was harmless at best. Moreover, Appellant's theory at trial focused on an insanity defense for which he was affirmatively offering evidence of his attempted suicide. We fail to see how his trial

7

counsel would be negligent in not excluding the very evidence that he was trying to admit in support of his trial theory.[3]

## Disqualification of the District Attorney

After the individual voir dire of the jury panel had already begun, Appellant filed a motion to disqualify the district attorney's office. The motion alleged that two assistant district attorneys had visited the crime scene the night of the murder and consequently had first-hand observations of the scene, making both the attorneys witnesses. The motion also asserted that the elected district attorney, Jaime Esparza, had visited the crime scene several days after the murders. Reasoning that a lawyer cannot be both an advocate and witness, Appellant contended that the El Paso District Attorney's Office should have been disqualified. When the motion to disqualify was heard, the argument took a different turn. Based on the testimony of one of the crime scene officers, Appellant contended that the district attorney's office was not only a witness having observed the crime scene, but also the district attorney's office directed the investigation and therefore controlled what evidence was preserved for later review. This involvement made them not only witnesses to the crime scene, but witnesses to potentially unpreserved exculpatory evidence.

For clarity, we summarize the testimony from the disqualification hearing. The crime occurred sometime in the late afternoon of January 28, 2011. Several patrol officers responded to the initial call and assisted other emergency responders who treated and transported Appellant to a local hospital. The Crimes Against Persons (CAP) unit handled the actual investigation. They were assisted by a crime scene unit consisting of five officers and one sergeant. The crime scene unit began arriving shortly after 5:00 p.m. and were all present for a briefing around 6:20 p.m. The crime scene unit set up a mobile command trailer outside the house. Sometime

---

[3] A theory, we note, that successfully kept Appellant from death row.

that evening, assistant district attorney Jennifer VandenBosch arrived at the scene. Another assistant district attorney, Nathan Brown, recalled arriving at about 7:00 p.m. and believed that VandenBosch was already there. Both assistant district attorneys stayed in the mobile command center while the crime scene unit documented the crime scene.

Specifically, several crime scene unit officers and a CAP detective took an initial walkthrough of the house. A videographer then filmed the entire crime scene, depicting the location of blood spatter, the bodies of the Flores women, and the condition of each room. Photographers then took still photos of the entire scene. The crime scene unit officers then placed markers by the all the evidence that they identified, including physical items and biologic evidence, such as the several knives and many blood spatters. More photographs were then taken. This process apparently took some six to eight hours during which time the assistant district attorneys stayed in the trailer outside.

Once the crime scene was documented as we describe above, the two assistant district attorneys went inside the house for some twenty to forty minutes. They wore protective gear to guard the integrity of the crime scene. The assistant district attorneys themselves collected no evidence and were not involved in the chain of custody. The crime scene officers then collected the physical evidence, including blood spatter evidence which was collected in swabs and placed in sealed envelopes with a numbering system to identify who collected it and where it was found.

Assistant district attorney VanderBosch described her role as purely advisory. She would have come to a major crime scene like this to confer with the police if they had questions about the issuance of search warrants during the early stages of any investigation. The only specific advice that VanderBosch claims she provided in this case related to the numbering of the blood spatters and other physical evidence. A crime scene technician will place a numbered marker

9

beside each splatter or piece of evidence to aide in the plotting of the evidence. Because of the extensive number of blood spatters in this crime scene, VanderBosch suggested a bifurcated alphabetic/Arabic numeral system to better track of the location of the evidence. The crime scene technician followed her suggestion. Assistant district attorney Brown was new to the unit and only went to the scene to observe and learn.

Evidence specialist Martin Martinez testified at the disqualification hearing. He also recalled that VandenBosch suggested the numbering system for the numerous blood spatters at the scene. But Appellant focuses particularly on Officer Martinez's testimony that on day of the murder he recalled VandenBosch "being at the scene and she gave me some advice as to what she wanted collected *and not collected*." [Emphasis added]. [4]

Several days after the murder, Officer Martinez went back to the scene with VandenBosch. He believed the purpose of that visit was to collect additional blood swabs and take more photographs that VandenBosch desired. VandenBosch did not recall the purpose of the second trip. District Attorney Jaime Esparza also went to the crime scene several days after the murder. He was at that scene for less than thirty minutes. Esparza disagreed with the proposition that having assistant district attorneys available at crime scenes made them witnesses, or was otherwise improper. In his words, if they gave advice to the on-site officer, it would be no different than if "they send me the case and I send it back for further investigation."

Rule 3.08 of the Texas Disciplinary Rules of Professional Conduct generally prohibits a lawyer from being "an advocate before a tribunal . . . if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's

---

[4] The trial judge directly questioned Martinez and asked if VandenBosch was directing the collection of specimens. While he agreed at times with leading questions using phrases such as she "directed you" to collect certain evidence, we believe that in context, his testimony is that VandenBosch made suggestions. At trial, he recanted the claim that VandenBosch had told him which evidence not to collect and claimed that the only advice that she gave related to the numbering system.

client." TEX. RULES DISCIPLINARY P. R. 3.08, *reprinted in* TEX.GOV'T CODE ANN. tit 2, subtit. G, app. A-1 (West 2013). There are exceptions, such as when the testimony relates to an "uncontested issue" or the testimony will "relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition." *Id*. at 3.08(a)(1),(2). Showing a violation of the State Bar's disciplinary rules, however, is not sufficient in itself to compel the disqualification of an attorney. *See Buntion*, 482 S.W.3d at 76 (discussing trial court's limited authority for disqualifying elected district attorney). Nor is the failure of the trial court to apply the disciplinary rules sufficient to warrant a reversal of a conviction on appeal. *Brown v. State*, 921 S.W.2d 227, 230 (Tex.Crim.App. 1996). Rather, the moving party must also show actual prejudice resulting from opposing counsel's service in the dual role of advocate-witness. *Gonzalez v. State*, 117 S.W.3d 831, 837 (Tex.Crim.App. 2003).

Actual prejudice requires that the defendant show "the alleged disciplinary rule violations by opposing counsel deprived him of a fair trial or otherwise affected his substantial rights." *House v. State*, 947 S.W.2d 251, 253 (Tex.Crim.App. 1997). The burden is on the party seeking disqualification of the prosecutor to present evidence establishing the existence of that prejudice. *In re Guerra*, 235 S.W.3d 392, 430 (Tex.App.--Corpus Christi 2007)(orig. proceeding). The party seeking disqualification cannot invent the necessary prejudice by unnecessarily calling the opposing counsel as a witness. *Gonzalez*, 117 S.W.3d at 838.[5]

The trial court denied the disqualification motion. Although the ruling spans several pages of the record, we glean that the judge principally denied the motion because Appellant did not show that his due process rights were violated. In his first point of error, Appellant seizes

---

[5] Appellant also premises his argument on TEX.CODE CRIM.PROC.ANN. art. 2.01 (West 2005) which states a prosecutor's "primary duty" is "not to convict, but to see that justice is done." Neither the original, nor two amended motions to recuse ever raised this specific ground. As a basis for disqualification, we consider the argument waived. Moreover, Appellant cites no authority that a breach of this obligation is a proper basis upon which to disqualify a district attorney.

upon a statement by the judge that Appellant's counsel had "missed the ball" to suggest that a more well developed record would had resulted in a disqualification. He now claims his attorneys were ineffective by not developing that record.

While the trial court made several observations that the assistant district attorneys had crossed the line between their role as advocates and witnesses, we are not required to reach the merits of that conclusion. Instead, we overrule the claim because the remaining premise of Appellant's argument lacks merit. At the outset, we fail to see how the district attorney and his assistants are witnesses simply because they observed first-hand what had already been documented by a video and numerous still photographs. No claim was ever raised that the video or photographs failed to document some material aspect of the crime scene that the attorneys were able to view. The disciplinary rules contemplate that attorneys may appear as witnesses for uncontested matters, and the appearance of the crime scene was uncontested on the record before us. In any event, the State did not call any of these attorneys to the stand as they proved up the crime scene evidence through their other witnesses.

Appellant's other theory that the district attorneys controlled the investigation fares no better. Appellant contends that had his trial lawyers better developed their case with the crime scene unit officers, they could have shown some prejudice based on how the evidence was collected, or not collected. From that, Appellant theorizes that his attorneys could have shown the due process violation necessary to obtain the district attorneys' disqualification. Nothing in the record supports that claim.

Contrary to Appellant's claim that his attorneys did nothing to develop a record from the crime scene unit officers, the trial testimony shows that each testifying officer from that unit was cross-examined about the conduct of the assistant district attorneys. Each officer responded that

12

they either did not recall the assistant district attorneys at the scene, or recalled no direction that they took from them other than the suggested evidence numbering system. The trial judge specifically stated that he would reconsider granting the disqualification motion as the trial progressed if the evidence showed a due process violation. Appellant's trial counsel attempted to develop that record, but the facts simply did not fit the claim. Appellant fails to detail what additional actions his counsel might have taken to develop a different record. Accordingly, Appellant has failed to demonstrate that his trial counsel breached an objective standard of care.

*Strickland* also requires Appellant to show prejudice. Here, the only specific example of any claimed prejudice arises out the failure to test certain blood evidence from the crime scene, which in turn was allegedly directed by the district attorney's office. Because that same issue is raised in Appellant's third point of error, we turn to it next.

## PREJUDICE FROM THE FAILURE TO TEST EVIDENCE

In his third point of error, Appellant contends that the record in fact already shows that his due process rights were violated because of the district attorneys' involvement in the investigation of the case, and in particular its decision not to test certain blood evidence from the crime scene. The State's investigative procedures might well be so improper so as to deny a defendant due process of law. *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969)(improperly orchestrated identification procedure denied defendant due process); *Ex parte Brandley*, 781 S.W.2d 886, 891-92 (Tex.Crim.App. 1989)(ignoring and suppressing exculpatory information about other suspects denied defendant's right to due process). Appellant contends that the investigative procedures suppressed evidence favorable to him. If proven, that claim raises a viable due process challenge. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963)("[T]he suppression by the prosecution of evidence favorable to the

13

accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *cf Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333,102 L.8d.2d 281 (1988)(when the claim involves the failure to preserve potential evidence, the defendant must show "bad faith on the part of the police" to make out a viable due process violation.); *Brandley*, 781 S.W.2d at 891 (failure to disclose exculpatory information and test physical evidence).

In determining whether an accused's due process rights have been violated as a result of the State's investigative procedures, a reviewing court looks to the totality of circumstances. *United States v. Bagley*, 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Ex parte Brandley*, 781 S.W.2d at 893. To obtain a reversal, Appellant must show the evidence was material. *Bagley*, at 683, 105 S.Ct. at 3383; *Ex parte Brandley*, 781 S.W.2d at 893. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)("It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.").

Appellant focuses on the failure to test a large blood spot in the master bedroom, suggesting that the decision was driven by the district attorney's office. From this failure to test blood evidence, Appellant raises the specter of some prejudice to his case. While the police took many biologic samples from the crime scene, they were selective in what was sent out for testing. The actual testing is done by the Department of Public Safety which limits (due to budgetary constraints) the number of samples that can be tested at any one time. The CAP

14

detectives, the crime scene unit, and the district attorney's office, jointly discuss how to prioritize which samples need to be tested. The blood sample from the large blood spot in the bedroom was to be included in a third batch of samples for testing, but that group was never actually sent out.

But we note an important distinction between evidence which is never collected, and evidence which is collected but simply not tested. The blood sample from the large blood spot in the bedroom was available to be tested, and if it were indeed somehow important, Appellant himself could have sought that testing. TEX.CODE CRIM.PROC.ANN. art. 39.14 (West Supp. 2015) governs the inspection of evidence in a criminal case, and gives the defendant the right to inspect tangible evidence. That provision permits more than just a visual inspection, and in an appropriate case, a defendant can ask for actual testing. *See McBride v. State*, 838 S.W.2d 248, 250-51 (Tex.Crim.App. 1992)("[W]e find that a criminal defendant has a right to inspect evidence indispensable to the State's case because that evidence is necessarily material to the defense of the accused."); *Terrell v. State*, 521 S.W.2d 618, 619 (Tex.Crim.App. 1975)(failure to grant defendant's motion for discovery seeking an independent chemical inspection of the alleged controlled substance was reversible error); *Detmering v. State*, 481 S.W.2d 863 (Tex.Crim.App. 1972)(defendant entitled to more than just visual inspection of LSD). Under the rule, a defendant must show "good cause" for the inspection. *Quinones v. State*, 592 S.W.2d 933, 940 (Tex.Crim.App. 1980). But upon doing so, the defendant has an absolute right to an independent inspection of any evidence which is "indispensable to the State's case." *Bates v. State*, 587 S.W.2d 121, 131 (Tex.Crim.App. 1979).[6]

_____

[6] The trial in this case started on August 27, 2013. For a trial starting after September 1, 2013, the Legislature codified a new set of procedures for designating which biologic samples must be tested in a capital case. *See* Act of June 14, 2013, 83rd Leg., R.S., ch. 1349, § 1, 2013 TEX.GEN.LAWS 3586 (codified at TEX.CODE CRIM.PROC.ANN. art 38.43 (West Supp. 2015). That enactment creates a defined procedure for determining which biologic samples

Appellant made no effort below to have the bedroom blood evidence tested. Nor would we have expected such a request based on this record because the evidence already showed that the blood was likely from Appellant. Ms. Gallindo found Appellant in the bedroom covered with blood. He made a deep cut into his wrist in an apparent suicide attempt, and he had lost two to four pints of blood. The State tested the blood on the knife that was found in the bedroom and it was found to have blood consistent with Appellant. The clear inference from all of this evidence is that the blood in the master bedroom, including the large blood spot, was from Appellant. He offers no suggestion that further verifying (or even denying) this conclusion would aide his defense.

The importance of testing that particular evidence, or more to the point, the lack of importance, is highlighted by: 1) the absence of any effort by Appellant below to request that it be tested; and 2) the lack of any explanation in Appellant's briefing as to how that testing would have affected the defense. We accordingly overrule Point of Error Three. Additionally, because Appellant has not shown that the district attorney's participation in the investigative process, even if it occurred as he claims, prejudiced his defense he has also failed to meet *Strickland*'s prejudice element for the ineffective assistance of counsel claim under his disqualification theory. We therefore overrule Point of Error One.

## EXCLUSION OF FACT WITNESSES

In his second point of error, Appellant complains of the exclusion of several lay witnesses who would have testified in support of his insanity defense. The four witnesses include Viviana Martinez (a sister), Jesse Martinez,(a brother), Victor Cantu (a friend) and Guadalupe Martinez, (Appellant's mother). The siblings and the friend all lived in San Antonio and had seen Appellant on a daily basis from August 2010 to early January 2011 when Appellant

must be tested. *Id.*

16

was visiting there. They would have described Appellant's odd behavior, including incessant pacing, opening and closing cabinets and drawers for no reason, or apparently talking to himself.

Cantu described Appellant during this time as "weirded out" and as if he had a different personality. Appellant also at times appeared afraid as if "something [was] next to him." At other times, Appellant "would act a little crazy" getting up and leaving and then calling in five to ten minutes to ask Cantu how he was doing, and stating he was on his way over. Cantu would have recounted a time when Appellant, while returning from a party, for no reason accelerated the car he was driving and ran into a light pole. He would at times have a blank stare or have periods when he was "not there." Appellant also told his sister that he would not live past age eighteen, when he was already twenty-one years old at the time. These witnesses would have testified that Appellant was unusually quiet or seemingly depressed, and that he had changed from when he was a child.

Appellant moved back to his mother's house in El Paso a few weeks before the murders. His mother would have testified that Appellant was diagnosed with Kawasaki disease and that while he was a happy child, by age nine he had become very withdrawn.[7] During his childhood, he would hit himself on the head. She would have testified that Appellant had an abusive father, and was never able to live on his own. His mother was aware that he abused marijuana and alcohol. She would have also described his constant opening and closed of drawers and cabinets.

The trial judge excluded these witnesses from the guilt-innocence phase of the trial, explaining their testimony lacked relevance, was cumulative of the evidence the experts were going to proffer, was too time consuming, and would confuse the issues. The trial court suggested, however, that the testifying doctors could speak with the relatives and include the

---

[7] Kawasaki's disease is described in the record as causing an inflammation of the arteries, which *might* include the small arteries in the brain, and *might* have an effect on the central nervous system.

17

described behavior as part of their analysis if it was relevant to the insanity issue. Both of Appellant's testifying doctors had in fact already spoken with Appellant's mother, and one of the expert reports, which was admitted into evidence, recounted everything that Appellant sought to have the mother testify about live at trial. One of the experts did in fact speak with the siblings and the friend prior to taking the stand. That expert's testimony included the description of the auditory hallucinations and discussed the opening and closing of drawers. The expert testified that the interviews of the siblings and the mother corroborated his understanding of Appellant's conduct.

As a general rule, we review a trial court's decision to admit or exclude evidence for an abuse of discretion and we will not reverse the ruling as long as it falls within the zone of reasonable disagreement. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex.Crim.App. 2006); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1991). We must uphold the trial court's decision "[i]f the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made." *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex.Crim.App. 2004).

Insanity is an affirmative defense that is appropriately submitted to the jury when the evidence shows, at the time of the conduct charged, the actor as a result of severe mental disease or defect did not know that his conduct was wrong. TEX.PENAL CODE ANN. § 8.01(a)(West 2011). Evidence relevant to the insanity defense includes "observation evidence" from those who can describe what a defendant said or did. *Clark v. Arizona*, 548 U.S. 735, 757-58, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006). "[O]bservation evidence can be presented by either lay or expert witnesses." *Id*. The Court of Criminal Appeals has held that "predicated lay opinion

18

testimony when considered with facts and circumstances concerning an accused and of the offense may be sufficient to raise [the insanity defense]." *Pacheco v. State*, 757 S.W.2d 729, 736 (Tex.Crim.App. 1988). However, the *Pacheco* opinion also reaffirmed two prior decisions in which it was determined "that the evidence of lay witnesses, who never undertook to express a conclusion or opinion on insanity, [were] not sufficient to raise the issue." *Id*. at 735, *citing Denison v. State*, 651 S.W.2d 754 (Tex.Crim.App. 1983) and *Cato v. State*, 534 S.W.2d 135 (Tex.Crim.App. 1976).

The *Pacheco* opinion arose out of a case from this court, and on remand, we held that the lay witness testimony there did not raise the insanity issue. *Pacheco v. State*, 770 S.W.2d 834, 836 (Tex.App.--El Paso), *pet. ref'd,* 769 S.W.2d 942 (Tex.Crim.App. 1989)(*per curiam*). The defendant broke into a house and claimed to the astonishment of the actual homeowner, that the defendant lived there. Some of the lay testimony at issue came from the true homeowner who testified that the defendant "may have been either drunk or drugged or not in his right mind--he was not very well." *Id*. at 836. An eyewitness also testified that the defendant was "just not right." *Id.* We concluded this testimony did not raise the insanity issue because the witnesses were speculating on the cause of the defendant's abnormal behavior during that one brief occasion. *Id*. In another reported decision, lay testimony that a defendant was "not himself" did not amount to an opinion on sanity. *Kelly v. State*, 195 S.W.3d 753, 756 (Tex.App.--Waco 2006, pet.ref'd). Nor was testimony that the defendant had "an altered mental status," or was depressed sufficient to raise the insanity defense. *Id*. at 757.

More recently, this court found that lay descriptions of a defendant such as he "seemed . . . very, very angry," "did not seem right in the head," was "a little slow" or wanted "the police to kill him" insufficient to raise the insanity defense. *Carreon v. State*, 08-12-00196-CR, 2014

19

WL 4243583, at *1 (Tex.App.--El Paso Aug. 27, 2014, no pet.)(not designated for publication). Similarly, descriptions of conduct such as the defendant looked like he was thinking about something, did not appear to recognize his family, screamed, cursed, or paced, were insufficient to raise the defense. *Id.*

Parsing the specific testimony offered here, we note that much of it also fails to address the issue of insanity as would be submitted to the jury. The evidence of how Appellant changed from childhood into his young adult years does not support the existence of a severe mental disease or defect. Nor were the general statements about him being quiet, appearing depressed, or withdrawn, or had a blank stare relevant to his appreciation of right or wrong on the day of the murders. We reach the same conclusion with respect the friend's view that Appellant seemed "weirded out" or acted a "little crazy."

The most compelling testimony from these lay witnesses was the description of Appellant repetitively opening and closing cabinets or having possible auditory hallucinations. Assuming without deciding that this specific testimony was relevant to support Appellant's insanity defense, we view its exclusion as harmless. This very testimony came into evidence through the testifying experts, one of whom referenced discussions of Appellant's behavior with these very witnesses. A trial court's refusal to admit evidence is reversible only if the offered evidence is relevant and its exclusion was harmful to the accused. *See* TEX.R.APP.P. 44.2(b).[8] When the

---

[8] In a criminal case, we consider two possible harmful error standards. TEX.R.APP.P. 44.2(a) and (b)(stating different standard for reversible error depending on whether error is constitutional or not). Appellant does not brief which standard would apply here, but we have an independent duty to apply the correct standard. *Johnson v. State*, 43 S.W.3d 1, 5 (Tex.Crim.App. 2001)("it is the responsibility of the appellate court to assess harm after reviewing the record and . . . the burden to demonstrate whether the appellant was harmed by a trial court error does not rest on the appellant or the State."). In this instance, we apply the non-constitutional error standard in TEX.R.APP.P. 44.2(b). "[N]ot every erroneous exclusion of a defendant's evidence amounts to a constitutional violation." *Potier v. State*, 68 S.W.3d 657, 659 (Tex.Crim.App. 2002). The exclusion of evidence only rises to constitutional error "if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Potier*, 68 S.W.3d at 665. Because the evidence here was only repetitive of what the experts would testify to, and only some discreet portions of the lay testimony are even arguably relevant, the exclusion did not

same or similar evidence is elicited from another source, the exclusion of such evidence may be harmless. *See Womble v. State,* 618 S.W.2d 59, 62 (Tex.Crim.App. [Panel Op.] 1981)("When a defendant offers the same testimony as that objected to, or the same evidence is introduced from another source, without objection, the defendant is not in position to complain on appeal."); *Beckett v. State*, 05-10-00331-CR, 2012 WL 955358, at *2 (Tex.App.--Dallas Mar. 22, 2012, pet. ref'd)(not designated for publication)(excluded lay testimony for insanity defense which came in through expert witness was harmless); *Yerba v. State*, 08-12-00201-CR, 2014 WL 4919718, at *5 (Tex.App.--El Paso Sept. 30, 2014, no pet.)(not designated for publication)(exclusion of a portion of an expert's testimony was harmless when it was essentially a summary of already admitted medical records). Based on the record before us, the exclusion of the lay testimony was harmless error. We overrule Point of Error Three.

## RESTRICTIONS ON EXPERT TESTIMONY

In Appellant's fifth point of error, he complains of testimony excluded from one of his testifying expert, Dr. James Schutte. Dr. Schutte offered three broad opinions. First, he testified that Appellant was "mildly mentally retarded" based on IQ tests that the doctor administered.[9] Appellant's IQ as tested by Dr. Schutte on October 31, 2011 was "63", which placed Appellant in the bottom one percent of the adult population. Dr. Schutte's second opinion was that Appellant is afflicted with "schizoaffective disorder" which he describes as a combination of schizophrenia and depression. The depression elicits thoughts of suicide while the schizophrenia causes one to hear voices, see things which aren't there, or to have delusional ideas. And third,

---

"effectively preclude the defendant from presenting a defense." *Id*.

[9] Dr. Schutte administered the Wechsler Adult Intelligence Scale, 4th Edition (WAIS IV). The present day accepted nomenclature replaces the term "mental retardation" with "intellectual disability." For the purposes of this opinion we use the terminology used by the witnesses when summarizing their testimony, including the term "mental retardation", but use the term "intellectual disability" in our general discussion of the issue.

21

Dr. Schutte testified that as a result of the schizoaffective disorder, Appellant did not know at the time of the offense that his conduct was wrong.

Although it is less than clear from his brief, we believe that Appellant first complains about the trial court limiting Dr. Schutte from testifying about the intelligence tests that other experts administered to Appellant, and why the results of those tests were higher than the one Dr. Schutte administered. Several months after Dr. Schutte saw Appellant, Dr. Noah Kaufman administered an intelligence test resulting in a score of 71, which is just at the threshold for mild mental retardation. Many months later, the State's expert, Dr. Timothy Proctor, administered a test that resulted in a score of 78. Appellant wanted Dr. Schutte to discuss those scores, and particularly to discuss how something call the "practice effect" could have caused the scores to rise if the test is repeatedly administered. The "practice effect" describes the phenomena where the more one takes a test, the higher the test score is likely to be because of the familiarity with the test questions and test procedures. The trial court disallowed Dr. Schutte from discussing both the specific test scores found by the other experts, and from explaining why they might have been different. The trial court did allow Dr. Schutte to explain in general the "practice effect" and to further explain that if the tests were taken within a two year period of each other, one would expect the later results to be higher. The trial court also allowed Dr. Schutte to state that he had reviewed the other experts' testing, and that based on that review, he arrived at his ultimate opinion.

Dr. Schutte had previously reviewed all the other experts' testing results. Our record is less than clear whether he had based his opinion on the specific testing done by the other doctors, or merely reviewed them. Rule 703 provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed. If experts in the particular

22

> field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

TEX.R.EVID.R. 703. The rule itself, however, does not authorize the admissibility of the facts and data relied on by an expert in forming an opinion. *Huff v. Harrell*, 941 S.W.2d 230, 240 (Tex.App.--Corpus Christi 1996, writ denied). Nonetheless, common practice allows the expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts. *See Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221, 2228, 183 L.Ed.2d 89 (2012).

But in the context of this case, we find any error in the exclusion of such testimony to be harmless. The complaint focuses on Dr. Schutte's inability to discuss the results of other *intelligence tests* and then opine as to how the practice effect specifically explains those later results. Appellant never explains how the intelligence test results play into the ultimate issue of Appellant's claimed insanity at the time of the murders. Dr. Schutte testified that Appellant's intelligence deficit and his schizoaffective disorder were two separate issues. [10] Understandably, Dr. Schutte takes into consideration all the tests to see if they "fit" with the patient's overall presentation. He also testified that the actual IQ number was important to issues such as Social Security Disability and vocational placement. The IQ testing data also, in the doctor's words, "speaks to his mental state at the time of the alleged offense." The IQ test, however, was but one of many tests the doctor administered. We find no indication that a particular numerical intelligence deficiency supports Dr. Schutte's opinion that Appellant was not aware of the difference between right and wrong at the time of the murders. Stated otherwise, whether Appellant's true IQ is 63, 71, or 78, was not important for the insanity defense.

---

[10] THE COURT: So you're basing your opinion, if I heard you correctly a while ago, that because he's mentally retarded that he was legally insane at the time and that he did not know that his conduct was wrong.
THE WITNESS: No, Judge. That is not my opinion.
…
THE COURT: Hold on a minute. For example, the IQ test does not indicate -- give you any indication he was suffering from hallucinations at the time of the offense or prior to that time. Correct?
THE WITNESS: That's correct. There's not a test for --

Even if the particular IQ score were relevant to the insanity defense, Dr. Schutte was allowed to testify about the practice effect. He told the jury everything that the jury needed to know so that they could conclude, if they so believed, that Appellant's successive and improving intelligence test results were explained by his increasing familiarity with the testing process. The State's expert also acknowledged the existence and importance of considering the influence of the practice effect.

Appellant next complains that Dr. Schutte was not allowed to testify to statements that Appellant made during their interviews. Appellant does not set out what those statements would have been, or how they would have affected the outcome of the case. In fact, the trial court allowed Dr. Schutte to testify to the statements Appellant made about what happened on the day of the murders. The trial court limited the discussion to that day, reasoning that the balance of the statements would be simply repetitive of what was already in Dr. Schutte's report which had already been introduced into evidence. We conclude that any limitation on Dr. Schutte's testimony has not affected Appellant's substantial rights and overrule point of error five. TEX.R.APP.P 44.2(b).

### IMPOSITION OF LIFE WITHOUT PAROLE ON THE MENTALLY IMPAIRED

In his fourth point of error, Appellant contends that his constitutional rights were violated by imposing a life sentence without the possibility of parole owing to his intellectual disability. Appellant, who was twenty-one at the time of the offense, contends that he mentally functions as a child, and that the United States Supreme Court has outlawed an automatic sentence of life without the chance of parole for children. *Miller v. Alabama*, ___ U.S. ___, 132 S.Ct. 2455, 2464, 183 L.Ed.2d 407 (2012)("We therefore hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on

24

'cruel and unusual punishments.'"). Effectively asking us to extend *Miller*, Appellant contends that his life-without-parole sentence violates the Eighth Amendment to the United States Constitution and Article 1, Section 13 of the Texas Constitution.

We first address whether this error has been forfeited. Prior to trial, Appellant filed two motions which address a life-without-parole sentence.[11] The trial court denied both motions. In one motion, Appellant challenged the constitutionality of TEX.CODE CRIM.PROC. ANN. art 37.071(1)(West Supp. 2015). That provision states:

> If a defendant is found guilty in a capital felony case in which the state does not seek the death penalty, the judge shall sentence the defendant to life imprisonment or to life imprisonment without parole as required by Section 12.31, Penal Code.

*Id*. The motion claims the automatic imposition of the life-without-parole sentence violates the Eighth Amendment by denying any consideration of individualized factors in a defendant's particular case. The motion makes no mention of Appellant's particular circumstances, but asked the trial court to declare the Texas sentencing scheme unconstitutional "as applied" to him.

Appellant was not sentenced, however, under section one of Article 37.071. The provision by its terms applies only when the State does not seek the death penalty. Instead, the State here asked for the death penalty and Appellant was sentenced under section two of Article 37.071 which allows for a punishment phase for the trial (but to be clear, the jury's choice is limited to only two options: death or life-without-parole). TEX.CODE CRIM.PROC.ANN. art 37.071(2). This particular motion did not challenge the constitutionality of a sentence arising out of Article 37.071(2).

---

[11]  The first motion was titled "Motion to Declare Article 37.071, Section 1, Unconstitutional on The Basis of The Eighth Amendment to The United States Constitution and Article 1. Section 13 of The Texas Constitution" and the second "Motion to Declare Article 37.071 Sec. 2(a) of the Texas Code of Criminal Procedure Unconstitutional on its Face."

Appellant also filed a separate motion challenging "on its face" the constitutionality of Article 37.071(2) because it fails to "set any discernible standards guiding the admissibility of evidence at a capital murder punishment phase trial [sic]." The motion asserts a violation of Eighth Amendment, but the basis for the argument is that section two gives no guidance to the admissibility of evidence, rendering any sentence imposed "cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman v. Georgia,* 408 U.S. 238, 309, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)(Stewart, J., concurring). This second motion does not raise Appellant's claimed intellectual disability. In other words, the claim made in the motion does not comport with the argument being advanced on appeal.

Under traditional TEX.R.APP.P. 33.1 concepts of error preservation, Appellant's contention under this point is forfeited. *See Lovill v. State*, 319 S.W.3d 687, 691-92 (Tex.Crim.App. 2009)("To preserve a complaint for appellate review, the record must show that a specific and timely complaint was made to the trial judge and that the trial judge ruled on the complaint."); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex.Crim.App. 2004)(objection based on one constitutional ground did not preserve another distinct constitutional ground); *Goff v. State*, 931 S.W.2d 537, 551 (Tex.Crim.App. 1996)(variance in objection made at trial with contention on appeal waived error); *Bell v. State*, 938 S.W.2d 35, 54 (Tex.Crim.App. 1996), *cert. denied,* 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997)(objection at trial regarding illegal arrest did not preserve claim of illegal search and seizure on appeal). Appellant never complained below that a life-without-parole sentence under Article 37.071(2) violated his rights under the Eighth Amendment as applied to him because of his intellectual disability.

Our only pause in accepting the State's forfeiture claim is the court's holding in *Garza v. State*, 435 S.W.3d 258, 262-63 (Tex.Crim.App. 2014). There, the defendant contended on

appeal that the imposition of a life sentence without the chance of parole violated his Eighth amendment rights, as found by *Miller v. Alabama.* The court of appeals held that Garza forfeited that claim because it had not been preserved below. *Garza v. State*, No. 04-11-00891-CR, 2012 WL 5236048, at *1 (Tex.App.--San Antonio Oct. 24, 2012)(mem. op.)(not designated for publication). On petition for discretionary review, the Court of Criminal Appeals reversed, reasoning that its earlier opinion in *Ex parte Maxwell,* 424 S.W.3d 66 (Tex.Crim.App. 2014) held by "necessary implication that a claim asserting an Eighth Amendment violation under *Miller* was not subject to procedural default." *Garza*, 435 S.W.3d at 261.

A defendant's rights fall into one of three categories: absolute rights (which cannot be forfeited by inaction); non-forfeitable rights (which can be waived but only by plainly, freely, and intelligently made action); and forfeitable rights (which must be requested and otherwise preserved). *Id*. *Garza* holds that "substantive status-based or individualized-sentencing claims under the Eighth Amendment and embraced by *Miller* are not forfeited by inaction." *Id.* at 262-63.

But Appellant is not arguing that *Miller* directly controls the outcome of this case. Instead, he argues that his mental status makes him the functional equivalent of a juvenile, and thus the same logic in *Miller* should also apply to him as well. In an analogous context, Fourteenth Court of Appeals has held that merely asking for an extension of *Miller* does not place one into a non-forfeitable right category. *Cerna v. State*, 441 S.W.3d 860, 868 (Tex.App.--Houston [14th Dist.] 2014, pet. ref'd), *cert. denied*, __U.S___, 136 S. Ct. 60, 193 L.Ed.2d 61 (2015). In *Cerna*, a defendant challenged his mandatory life sentence. The defendant was an adult, but argued the rationale of *Miller* should apply to him and required individualized considerations of his circumstances. He failed to preserve that issue at the trial

27

court, but argued that the holding in *Garza* meant that he did not need to preserve the complaint below. The appellate court disagreed, and reasoned that when a litigant is asking for an extension of *Miller*, an absolute or forfeitable right was not stake. We agree with their logic and similarly find Appellant's complaint forfeited. *See also Stiner v. State*, 14-13-01118-CR, 2015 WL 495019, at *3 (Tex.App.--Houston [14th Dist.] Feb. 5, 2015, pet. ref'd)(adult seeking to extend *Miller* similarly failed to preserve error).

But even if we were mistaken that the claim is forfeited, we would overrule the issue based on the present state of the law and the record here. Several courts have held that in general, an automatic sentence of life-without-parole is not unconstitutional when assessed against an adult offender convicted of capital murder. *See Sloan v. State*, 418 S.W.3d 884, 891– 92 (Tex.App.–Houston [14th Dist.] 2013, pet. ref'd)(refusing to extend *Miller* to adult-offenders); *Wilkerson v. State*, 347 S.W.3d 720, 722-23 (Tex.App.--Houston [14th Dist.] 2011, pet. ref'd) (holding that an automatic sentence of life-without-parole did not violate either the United States Constitution or the Texas Constitution).

Appellant's specific argument (that *Miller* applies to adults with intellectual disabilities) does not square with all of *Miller*'s rationale. Drawing on its earlier cases, *Miller* distinguished children from adults in three important respects:

> First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

*Miller*, 132 S. Ct. at 2464 (internal ellipses, quotations, and cites omitted). The last element--the fact that a child's future is not fixed and is susceptible to rehabilitation, was repeatedly

28

emphasized by the majority opinion. *Id*. (noting studies showing only a relatively small proportion of adolescents develop entrenched patterns of problem behavior); *id*. at 2464-65 ("as the years go by and neurological development occurs, his deficiencies will be reformed") (internal quotes and citations omitted). Appellant makes no showing that this same prospect for improvement applies to intellectual disabilities in general, or Appellant in particular. The most the record supports is that with medications (assuming he takes them) Appellant's auditory hallucinations have resolved. But there is no showing that Appellant's destructive impulses will simply go away as he ages. To the contrary, the jury found just the opposite, concluding he posed a future danger to society.

Nor does the other case cited by Appellant, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), aid his case. There, the court concluded that executing the mentally retarded would be a cruel and unusual punishment prohibited by the Eighth Amendment. It did so based on the different moral culpability of the intellectually impaired. *Id*. at 306. The court also reasoned that mental impairments jeopardize the reliability and fairness of the trial process for those individuals. *Id*. at 307. But another important consideration in the Eighth Amendment analysis was an evolving consensus of recent "American public, legislators, scholars, and judges" that had concluded the death penalty should not be imposed on a mentally retarded criminal. *Id*. That consensus was reflected in a number of states legislatures, including Texas, which had passed laws prohibiting the execution of those with mental disabilities. *Id*. at 315. Appellant points to no similar evolving consensus prohibiting life-without-parole sentences for those with intellectual disabilities, and we are aware of none ourselves.[12] We overrule Point of Error Four.

---

[12] *See* Natalie Pifer, *Is Life the Same As Death?: Implications of Graham v. Florida, Roper v. Simmons, and Atkins v. Virginia on Life Without Parole Sentences for Juvenile and Mentally Retarded Offenders*, 43 LOY. L.A. L. REV.

**CONCLUSION**

For the reasons noted, we overrule all five points of error and affirm the capital murder conviction. The trial court certified Appellant's right to appeal in this case, but the certification does not bear Appellant's signature indicating that he was informed of his rights to appeal and to file a *pro se* petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX.R.APP.P. 25.2(d). The certification is defective, and has not been corrected by Appellant's attorney or the trial court. To remedy this defect, this Court ORDERS Appellant's attorney, pursuant to TEX.R.APP.P. 48.4, to send Appellant a copy of this opinion and this court's judgment, to notify Appellant of his right to file a *pro se* petition for discretionary review, and to inform Appellant of the applicable deadlines. *See* TEX.R.APP.P. 48.4, 68. Appellant's attorney is further ORDERED to comply with all of the requirements of TEX.R.APP.P. 48.4.

August 24, 2016

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Do Not Publish)

---

1495, 1528 (2010)("Here, there is considerably less evidence directly signifying society's condemnation of sentencing mentally retarded offenders to life without parole than there was in *Atkins*, *Roper*, and *Graham*.").